UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| GARY | CIVIL ACTION NO. 19-00594 |
| VERSUS | JUDGE MICHAEL J JUNEAU |
| COMMISSIONER OF SOCIAL SECURITY | MAGISTRATE JUDGE WHITEHURST |

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability referred by the district judge for Report and Recommendation. Considering the administrative record, the briefs of the parties, and the applicable law, the Commissioner's decision is affirmed.

## Administrative Proceedings

The claimant, Janet Marie Gary, fully exhausted her administrative remedies before filing this action in federal court. On February 24, 2016, she filed applications for a period of disability, disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") alleging that she became disabled on January 1, 2016. *R. 16.* Her applications were denied. *Id.* She requested a hearing, which was held before Administrative Law Judge Lawrence T. Ragona. *Id.*. The ALJ decided that the claimant was not disabled within the meaning of the Social Security Act

1

from January 1, 2016 (the alleged disability onset date) through June 11, 2018 (the date of the decision). *T. 13-36.* Claimant requested review of the decision, but the Appeals Council found no basis for review. Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Claimant then filed this action seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born in 1970. At the time of the ALJ's decision, she was 45 years old. She graduated from high school and later attended college and received her undergraduate degree in General Studies. *T. 58.* She has relevant work experience as a restaurant manager.

## Analysis

### A. Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164

(5th Cir. 1983) Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.*

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence, *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985), and credibility assessments, *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991), are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Id.*

### B. <u>Entitlement to Benefits</u>

The DIB program provides income to individuals who are forced into

involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). If unmarried and between fifty and sixty years old, the widow of a fully insured individual is entitled to widow's insurance benefits if she is disabled and her disability began no more than seven years after the wage earner's death or seven years after he was last entitled to survivor's benefits. 42 U.S.C. § 402(e); 20 C.F.R. § 404.335. Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits. 42 U.S.C. § 1382(a)(1) & (2).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for

work. 42 U.S.C. § 1382c(a)(3)(B).

## C. **Evaluation Process and Burden of Proof**

The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled. This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. §§ 404.1520(a)(4). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity, 20 C.F.R. § 404.1520(a)(4), by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can

perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Id.* at 1302; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan*, 38 F.3d at 236.

### D. **The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 1, 2016. *T. 19.* This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: rheumatoid arthritis, with osteoarthritis; lumbar degeneration; obesity; major depressive disorder; various anxiety disorders, including obsessive-compulsive disorder (OCD) and a panic disorder; attention deficit hyperactivity disorder (ADHD); and status post carbon monoxide poisoning, associated neurocognitive issues. *T.19*. This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant's impairments did not meet or medically equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. T.20-22. The claimant challenges this finding.

The ALJ found that the claimant had the residual functional capacity to perform light work "except that due to emotional problems, she cannot perform complex work, and requires a work environment with only occasional interactions with others (as she is more comfortable working with things rather than people); and, due to medication side effects such as occasional dizziness, she cannot work at jobs that involve heights or operate dangerous machinery." *T.22*. The claimant challenged this finding.

At step four, the ALJ found that the claimant was unable to perform her past relevant work as a restaurant manager. *T.28* The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled as she had the RFC to perform the occupations of housekeeper, labeler, document specialist, and ticket checker. *T.29*. The claimant challenged this finding.

### E. The Allegations of Error

The claimant contends that the ALJ erred by improperly evaluating the medical opinion evidence and by failing to properly evaluate whether the claimant

7

met Listing 12.04.

### F. Evaluation of the Treating and Examining Physicians' Opinions

This Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).

The claimant contends the ALJ erred by improperly rejecting the medical opinions of Dr. Susan E. Ulrich, M.D., her treating physician, and Dr. Naomi L. Friedberg, Ph.D., her examining physician, in making his RFC assessment without good cause and without providing a detailed discussion of all the factors listed at 20 C.F.R. §§ 404.1527(c), 416.927(c). *R. 16, pp. 3-7*, *T. 461-464, 521*.

The Social Security regulations and rulings explain how medical opinions are to be weighed. 20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p. Generally, an ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. Disability cases typically involve three types of physicians: 1) a treating physician who regularly provides care to the claimant; 2) an examining physician who conducts a one-time physical exam of the claimant; and 3) a reviewing or non-examining physician who

has never examined the claimant, but read the claimant's files to provide guidance to an adjudicator. Because the treating physician is most familiar with the claimant's impairments, her opinion should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir.2000). If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). Likewise, when a treating physician has reasonable knowledge of the impairment, her opinion is given more weight than an opinion from a non-treating physician. *Id.* …. Treating physicians' opinions also receive greater weight "[w]hen the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." *Id.* The weight given to opinions from non-examining physicians depends on "the degree to which they provide supporting explanations for their opinions." *Id.* § 404.1527(d)(3)." *Giles v. Astrue*, 433 Fed.Appx. 241, 246 (5th Cir. 2011).

Dr. Uhrich began seeing the claimant for psychiatric problems in 2008, after the claimant's in-patient psychiatric hospitalization for self-harm. *T., 340, 754.* The record contains an October 18, 2012 progress note from Dr. Uhrich. which stated that the claimant's manner was cooperative and she was engaged in the interview.

9

Her speech was normal and her thought processes and content were coherent and appropriate, with no delusional thinking. She had no thought of suicide or harm to others. Dr. Uhrich diagnosed "Major depressive disorder, recurrent severe without psychotic features; Obsessive-compulsive disorder; and Attention-deficit hyperactivity disorder; CO poisoning; Rheumatoid arthritis." She prescribed Remeron, Cymbalta, Trileptal, and Adderall as medications. *T. 505-510*. The records provided that Dr. Uhrich again saw the claimant in November, 2014, as well as in March, June, August, September and December 2015. *T. 481-531, 550-558.* Dr. Uhrich continued to see the claimant monthly from January 11, 2016 through December 2, 2016, *T. 521-529, 739–790*. Dr. Uhrich again examined the claimant from January 6, 2017 through July 12, 2017, on October 9, 2017, *T. 893-940*, and finally on January 19, 2018, *T. 1156*.

Dr. Uhrich's 2015 progress notes reflect that the claimant lost her job and moved in with her mother. Otherwise, her assessment of the claimant continued to be normal— her long and short term memory and cognitive thinking were normal; and her mood and affect were appropriate.

During her visits in 2016, Dr. Uhrich made general observations as to the claimant's demeanor including: "mental status no gross abnormalities," "calm, attentive, communicative, groomed, overweight, tense, anxious," "friendly and

communicative," "no signs of hallucinations, delusions, bizarre behaviors or other indicators of psychotic process," "associations" intact, thinking logical, thought content appropriate; "memory intact for recent and remote events," "no signs of anxiety." In March, the claimant stated she was exposed to carbon monoxide and implied it affected her memory. Dr. Uhrich's assessment, however, continued to reflect that the claimant was "normal", with no mental status abnormalities. Specifically, she noted the claimant's "memory is intact for recent and remote events" with no signs of anxiety. During visits in 2016 in which the claimant reported she was "not good" or was depressed, there were various reasons for such feelings, such as "her dad and niece" both died.

Also, on July 30, 2016, Dr. Uhrich completed a Medical Source Statement on the claimant.[1] Notably, she indicated the claimant's ability to understand and remember detailed instruction was "Marked" or seriously limited and her ability to carry out detailed instructions was "Extreme" or precluded. *R. 839.* She further indicated the claimant's ability to maintain attention and concentration for 2-hours was "Marked;" her ability to complete a normal workday was "Extreme;" her social interaction was "Extreme" and/or "Marked;" her ability to respond/relate to work-

---

[1] The Assessment defined "Moderate" as "capacity to perform the activity is impaired;" "Marked" as "cannot usefully perform or sustain the activity" and "Extreme" as "ability to function is precluded." *T. 839.*

11

related decisions was "Marked;" and work-related goals and changes were "Extreme." *T. 838-841.*

In 2017, Dr. Uhrich's notes revealed that the claimant endured difficult issues almost monthly – i.e., her closest friend was murdered; her sister and her brother had mental issues; she had a kidney stone; her mother and sister each lost their best friends; she lost a cousin in a fire and also one in a vehicular accident; her nephew was electrocuted; and, her mother needed continual oxygen and "was dying." Despite Dr. Uhrich's assessment that the claimant's demeanor revealed a depressed mood, in each of the 2017 visits, Dr. Uhrich noted the claimant's general assessment remained normal and unchanged. It was not until the October, 2017, that she noted "signs of anxiety' and "difficulty remembering events." *T. 943.*

In January, 2018, Dr. Uhrich ordered an EVOKE cognitive test on the claimant. The test resulted indicated the claimant's memory was low but her overall cognitive performance was normal. *T. 1152-1155.* In her January 19, 2018 progress notes, Dr. Uhrich indicated the claimant was anticipating her upcoming court date. She noted the claimant's general assessment remained unchanged but that she continued to have anxiety and difficulty remembering.

The claimant contends the ALJ failed to consider her length of treatment and frequency of examination by Dr. Uhrich and the consistency of Dr. Uhrich's

opinions with the record. The record indicates the ALJ specifically indicated that Dr. Uhrich was the claimant's treating psychiatrist and had treated her since 2008 on a regular basis. *T. 25.* Moreover, the ALJ expressly considered Dr. Uhrich's opinions and discussed in detail the multiple treatment records from her. The ALJ found, however, that Dr. Uhrich's opinions were unsubstantiated by her own progress notes and therefore inconsistent with the record as a whole. The Court agrees for the following reasons.

Dr. Uhrich noted that the claimant had moderate ability to remember locations and work-like procedures, and to understand, remember, and carry out very short and simple instructions. Further, she found the claimant had marked and/or extreme inability to understand, remember and/or carry out detailed instructions. She further found the claimant was moderately able to sustain a work routine without supervision and extremely limited in her ability to complete a normal workday/week. The ALJ gave little weight to these opinions because he found it was contradictory of Dr. Uhrich's multiple treatment records documenting no mental or memory abnormalities. In fact, Dr. Uhrich's progress notes consistently reported normal mental status and cognitive ability. The records reflect the claimant only mentioned a memory problem immediately following her carbon monoxide exposure in early 2016 and not again until late 2017. Finally, the ALJ noted the claimant's EVOKE

assessment revealed her overall cognitive performance was within normal limits. *T. 1153*.

Dr. Uhrich also stated the claimant had extreme limitations in her ability to interact appropriately with the general public, maintain appropriate social behavior, including grooming and hygiene, and work in coordination or proximity with coworkers or peers. The ALJ noted that Dr. Uhrich's own progress notes consistently described the claimant as "friendly" and "communicative" as well as "groomed" and "appropriately groomed." He noted no significant history of violence or social interaction.

Ultimately, the ALJ concluded the evidence did not substantiate Dr. Uhrich's opinion that the claimant had significant social limitations. Instead, he found the claimant could work in an environment requiring only occasional interactions with others. Although the opinion "of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight," the treating physician's opinion "may be assigned little or no weight when ... the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Robinson v. Astrue*, 271 Fed.Appx. 394, 396 (5th Cir. 2008).

The claimant also contends the ALJ failed to consider the opinion of Naomi

14

Friedberg, Ph.D., who examined her one time on September 25, 2016, and then on referral by the claimant's attorney. *T. 893.* Dr. Friedberg referred to Dr. Uhrich's July 30, 2016 Medical Source Statement as well as Dr. Uhrich's treatment notes from her evaluation of the claimant. Dr. Friedberg stated that the claimant's "ability to understand, remember and carry out simple, moderate and complex instruction *appears* to be significantly impacted ... by the long term emotional and physical effects associated with fibromyalgia and carbon monoxide exposure." *T. 867.* She further stated that Dr. Uhrich's treatment notes of the claimant "reflect intermittent significant disturbances in daily function due to severe depression anxiety and sleep disturbance." *Id.* She opined that the claimant's "ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek is significantly impaired...." *Id.*

None of Dr. Friedberg's opinions were based on her own evaluation or personal observation of the claimant. Rather, she completely relied on Dr. Uhrich's conclusions which the ALJ found were made without the support of substantial evidence. The ALJ correctly noted that Dr. Friedman was not a treating physician and gave "little weight" to her opinion. The ALJ was not required to perform a detailed analysis of the 1527(c) and 927(c) factors before declining to adopt Dr. Friedman's opinion. *See Robinson*, 271 F. App'x at 396 (a one-time consultative

15

examiner is not afforded the same deference as a treating physician); *Ciccotti v. Astrue*, 2010 WL 3022775, at *9-10 (W.D. Tex. July 28, 2010) (the ALJ does not have to analyze an examining physician's opinion under the [1527(c)] factors).

Lastly**, t**he claimant contends the ALJ erred in failing to find that the severity of the claimant's symptoms meet the criteria of Listing 12.04. In evaluating a claimant's mental impairment, the ALJ must follow the procedure set forth in 20 C.F.R. § 404.1520a. Section 404.1520a requires an ALJ to evaluate the impact of a claimant's mental impairment on four broad functional areas, known as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(3). At Step Two in the evaluation process, the paragraph B criteria are used to determine whether a claimant has a severe mental impairment. Id. § 404.1520a(d). At Step Three, the paragraph B criteria are used to determine whether a claimant meets a listing and can therefore be presumed disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). Here, to satisfy the paragraph B criteria of Listing 12.04, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning: understanding, remembering, or applying or managing themselves.

Based on the record, including Dr. Uhrich's reports, the ALJ found the

16

claimant had moderate difficulties with memory. The ALJ based his conclusion on the claimant's short and long term memory capacities as observed by Dr. Uhrich and set out in her notes. The ALJ further evaluated the claimant's interactions with others as moderate based on her history of having no difficulty getting along with coworkers or other people in her life. While she was reportedly fired because of anger management issues she stated she believes she was "sabotaged." Also she reported difficulty handling her anger in conjunction with physical pain. The ALJ also specifically cited the record as to his assessment of the claimant's moderate limitation with regard to concentrating, persisting or maintaining pace. He further found a moderate limitation for adapting or managing herself based Dr. Uhrich's notes as well as those of her other health care providers which provided that her behavior was "appropriate", "normal" with "age-appropriate" dress and grooming despite her OCD diagnosis.

The Commissioner contends the claimant has waived her claim as to listing 12.04 because she pointed to no evidence to explain her position that the ALJ improperly found that she did not meet this specific listing. Nonetheless, the Court finds the ALJ relied on substantial evidence in finding that the claimant did not satisfy Listing 12.04. As the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation the ALJ found the paragraph

B criteria of 12.04 were not satisfied.

## G. <u>Evaluation of the Claimant's Residual Functional Capacity</u>

The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations. *Martinez v. Chater*, 64 F.3d at 176.

The claimant does not contend that the ALJ made an improper RFC assessment or that substantial evidence does not support the RFC. Rather, she argues that the ALJ erred in her analysis of the medical opinions. The Court finds, however, that substantial evidence supports the ALJ's allocation of the weight given to the various physicians in this case and the resultant RFC.

## <u>Conclusion</u>

Given the foregoing, it is the conclusion of this Court that the decision of the Commissioner be AFFIRMED and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may

respond to another party's objections within fourteen days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** this 13th day of November, 2020.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**